from the court. The admonition here, number one, is to stay in the microphone so that the recording and we can hear your responses. And number two, is to answer the questions that the court has as succinctly and directly as you possibly can. When you get the red light on, it does mean stop your argument. However, if the court has asked you a question, you ought to answer that question as straightforward and succinctly as you possibly can. With that said, I call the case, Taylor Bell. On the Bell side, Mr. Ziccolombe. Good morning, Your Honors. When I was discussing this case with an Ole Miss law professor, he asked me whether I would punish Taylor for his song if he were my son. And I admitted to him that I would. But the question before this court is not whether parents should punish their children for speech like Taylor's songs, but whether the government is so big and so powerful that it can reach into a parent's home, into a student's computer, and punish a student as if it were the student's parents. Thankfully, this court answered that question in 1972, when it said in Shanley v. Northeast Independent School District that, and I quote here, it should have come as a shock to the parents of five high school seniors that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's right of expression of their thoughts. Do you think your argument may be a little weak if you start off with a 1932 case? It's a 1972 case, Your Honor. That was before the internet, before the world we live in today by a long shot. Your Honor, what's important about that language in the case is the principle it established, which is that the government doesn't have the power to control what students say away from school. If you follow that up with the Supreme Court's case, Tinker v. DeMoss, the famous student speech case, if you read that case carefully, you can see that the exception that the Supreme Court recognized was based on the need for the schools to be able to maintain order and control during school hours. The Supreme Court recognized that you can't have students disrupting school during the middle of teaching or during the middle of coaching, but it limited that holding to the schoolhouse game. If you look at the following decisions the Supreme Court has made, they've always limited the Tinker's reach to the schoolhouse game. For example, in Bethel v. School District v. Fraser, it pointed out that it was only because the speech was at a school assembly and you had a captive audience of students that for no practical purpose had to be at the school that the school had the ability to regulate that speech. Are you drawing a difference between political speech and the threat to kill someone? Well, Your Honor, what I would say... You draw the same degree of First Amendment protection? Well, Your Honor, what I would do is refer to the United States Supreme Court, United States v. Watts, which says true threats are not protected First Amendment speech, and it applied a standard to determine whether it's a true threat. Was Watts a school-related case? Not a school-related case, but the Supreme Court has always recognized that away from school, students and Why isn't there at least a fact issue on whether this is a true threat when he said, I'm going to hit you with the Ruger, going to get a pistol down your mouth, Bob? Well, first of all, Your Honor, he doesn't say that. What he says in the lyric is messing with the wrong one, going to get a pistol down your mouth. Now that's a condition, that language is conditional. The song is about the coach's inappropriate conduct with female students, and he's saying, conditionally, that if the coaches continue that, somebody in the public might react. Why isn't that a fact issue of whether it's a conditional statement or an actual threat? Well, Your Honor, because the language is not in dispute. There's no genuine issue of a dispute about what the words are, and also there's no genuine issue of dispute about the fact that it's in the context of music. If you were to apply the true threat standard to Taylor's song and rule that that's a sincere, genuine threat, then there's a whole host of music out there that's now subject to criminal liability. I mean, Judge Barstow, in his defense, pointed out that some of the music that I referred to, the Bob Marley song, I Shot the Sheriff, I Didn't Shoot the Deputy, and the Johnny Cash song, I Shot a Man to Watch Him Die, he said those were fictional people. So that was the One of the most famous artists of the last 20 years is a hip-hop artist named Eminem. He has numerous songs where he talks about killing his wife. I know you can talk about this as hard all you want, but if it were my kid who was the target of cyberbullying perpetrated off campus, I would want everything done to the perpetrator that could possibly be done. Now, how do you distinguish the Fourth Circuit and other cases that involve cyberbullying? Well, Your Honor, the first analogy is that a parent has a right to be upset about speech like this. But the question is, does the government have the ability to regulate it? What about the Fourth Circuit case, Kowalski, where the little girl created a website off campus solely for the purpose of cyberbullying? Well, there's two important differences. First of all, that was to another student, not to coaches. I mean, these are adults, so they're not bullied in the same way that you have to worry about with high school students. The second of all, there's a big difference between private speech and public speech. The speech at Kowalski... I'm asking you a question, sir, and you're not answering it. Do you agree with the Kowalski decision which held that the school could suspend a student without notice for engaging in that conduct, or do you find it materially distinguishable here? The way you're describing First Amendment rights in very broad terms, it seems to me you'd have to disagree with Kowalski. Your Honor, I could distinguish Kowalski from Taylor Belsall, and there's one important factor, is that Kowalski, that was private speech. It was a speech to another student over the Internet. It had no public nature to it. Taylor Belsall was not private speech. He put it on YouTube. He wanted the public to hear it. That distinguishes it because he wasn't trying to make a private...it wasn't a private conversation. He was trying to bring attention to the public about what he viewed as misconduct by school teachers, which was reported by private affidavits, sworn affidavits, and so that's a distinguishing difference. Private affidavits that you refer to that were introduced at the preliminary injunction hearing were not before the school board when it made its decision to suspend and put Bell in the alternative school for threatening, harassing, and intimidating teachers. Those were kept for another proceeding with the coaches. So the school board was dealing with a threat to a teacher. Now, do you think that school boards have to hold some sort of trial before they can discipline a student for threatening, harassing, and intimidating a teacher? Well, what I would say is, first of all, those statements were offered to the school board before at the hearing. They chose not to deal with it at that time. So they had the information. They deal with that in a separate proceeding. Right. But here's the question. When you have speech like Mr. Bell's, you've got to determine what is the standard the Supreme Court put forth to determine whether it doesn't receive First Amendment protection. And off-campus speech, if you're going to have... You're talking about Tinker? I'm talking about the true threat, true threat analysis, because... I'm talking about Tinker. Okay. And the Supreme Court has not dealt with Tinker, why Tinker, since 1969 when they handed down Tinker. The Supreme Court hasn't dealt with off-campus speech under Tinker? Your Honor, but the Supreme Court has sent strong signals that when it comes to public speech, speech in a public forum, that students have the same First Amendment rights as adults. If you look at the last... Have you made this contention before that this is speech in a public forum? Because I don't remember reading it. I've read everything. Have you previously said this is speech in a public forum as if he's on a street corner? I believe, I don't know if I used those exact words, but from the very beginning... I think there's quite a difference. Well, to be honest, from the very beginning, we've contended that this is public speech. That it deserves more First Amendment protection because it wasn't just a private conversation between two students away from school. We've always said that it deserves more protection because it has a whistleblower aspect to it. I mean, Taylor has a whistleblower aspect to it. He's stating that these coaches are involved in inappropriate conduct. And if the court were to say that type of speech could be regulated, then that would have a chilling effect on students being able to... If the court were to one coach and says he's messing with these girls because his wife ain't got no titties, that makes it okay? Well, Your Honor, I understand that you dislike that lyric, right? And that makes sense. But the reality is, does the state have the power to discipline Mr. Bell because he said that? It's not the state. It's the school. We're talking about a student. I understand it's a governmental entity, but we're talking about disciplining a high school student based on finding that he threatened, harassed, and intimidated two teachers. That's what we're dealing with. But the school has the same standard as the state when it comes to a true threat analysis. And that is, it has to make a determination that a reasonable person would view it as a sincere threat. And if you look at, first of all, it's in the context of music. Would this have made any difference if it had been on-campus speech on the campus? Your Honor, if it was on-campus speech, then the Tinker Standard would have, without a doubt, applied. And under that standard, you would have had to determine whether there's enough evidence of a substantial disruption or potential for disruption. But again, there's no court that has applied the Tinker Standard to off-campus speech, has dealt with the ramifications of it. If a student, for example, in Mississippi, we have elected superintendents. If a student decided he didn't like his superintendent and he wanted to have a public rally when he spoke against the superintendent, under the Tinker Standard, that may potentially cause a substantial disruption at the school. Are we really going to say that that student doesn't have a right to do that? I mean, that would be the standard, that would be the result. That's not what we're dealing with. We're dealing with threats, intimidation, and harassment. We're not dealing with scholarly discussion or a public statement in a public forum about why the superintendent's not a good superintendent. We're dealing with threats, harassment, and intimidation. Your Honor, I would say, Judge Barstow, that most of the song, again, is about the allegations against the coaches. But even the lyrics that you keep referring to, you still have to apply the true threat analysis to it. And you've got to say it. If you can apply the true threat analysis to it, or you can apply the test under Tinker to it. Right. And if you apply the test under Tinker, first of all, you have to determine I'm not going to concede that the Tinker test applies to off-campus student speech. Because if it does, then you've got to apply it to a rap song and you've also got to apply it to a speech at a student rally.  I'm sorry, Your Honor. Four other circuits have considered applying Tinker to off-campus speech. Our court in 72 in Shanley and 73 in Sullivan did not say Tinker couldn't apply to off-campus speech. Four other circuits have held it does apply to off-campus speech. In the Fifth Circuit, there's a circuit split, the Third Circuit. So, of the courts that have considered it, the circuits that have considered it have consistently, by overwhelming majority, said that Tinker does apply to off-campus speech. It has to. When a student sends a message via social media it travels instantaneously to the school and the students there and to the students who attend that school, whether they're on the campus or not. How can you have a distinction between off-campus and on-campus speech when it involves the Internet? Well, Your Honor, you have to go back to the purpose of Tinker. Tinker was never about controlling what students hear and say. It was always about controlling order at the school. Mr. Colon, suppose this rap music, instead of attacking the teachers had threatened sexual violence on some of the female students. Would the school have been able to suspend Mr. Bell for that? What the school would have had to have done if it was off-campus speech, they would have had to determine whether the true threat applied. Even if we were to apply the Tinker statute. Even though it was lewd, vulgar, to put it mildly and then said we're going to do blank to these girls? You're saying the school would have no interest in that? Well, I would say this, the state doesn't have an interest in what musical artists say away from school. Well, now take Morse v. Frederick and I think you're placing too much emphasis on off-campus here. I think Justice Alito made it very clear in his view that anything that was necessary to protect students was within the purview of the school's regulation although political whistleblower, that kind of thing would not be. Well, Your Honor, I disagree a little bit with your characterization of Judge Alito's concurrence opinion. I think it actually supports me because what he said was that at school, students are at a school-sponsored event because at Morse, it was during school hours. Out of school because they let them go to the parade but it was during school hours. It was a school-sponsored event, teacher was there. He said because at school, students are basically the school is basically parents to the students. They have to act as local parents. But he also said that that's the far reaches of what the First Amendment permits. And he also talked about the fact that away from school, students don't have that responsibility. Parents have that responsibility. I know you don't concede that Tinker applies to off-campus speech but I'm going to ask you for a moment to assume, arguendo, that it does. Yes, Your Honor. So if it does, under Tinker, the school would be required to show that the speech caused a substantial disruption whether there were facts to support a reasonable conclusion that a disruption could result from the speech. Yes, Your Honor. What evidence is there of either of those in this case? I know you don't agree that it applies but let's assume that it does. Yes, Your Honor. Well, assuming it does, I think there's something important to point out. I didn't point it out in my recent brief. Judge Barksdale pointed out in his dissent that you had the teachers that changed their behavior as a result of the song. Well, actually, when the School Discipline Committee made its finding to suspend Taylor, they didn't have that information. The coaches didn't testify. Nobody said how the coaches felt. So when they made the decision to punish Mr. Bell, they knew nothing about this allegation that the coaches changed their behavior. When the school board made its decision, the coaches didn't testify. They didn't come talk. So the school board, when it made its decision to punish Mr. Bell, they had no knowledge about this allegation that the coaches changed their behavior. But also, if you look at what the potential or what the claim of disruption is, the idea they changed their behavior, that's a result not of the lyrics but that's a result of the allegations of misconduct. So that had nothing to do with it. No coach testified that I changed my teaching methods because of allegations of misconduct. One coach said I was frightened. There's no telling what happens these days in the world with violence. He said I do not let my basketball team leave the gym until I'm safely in my car. Another coach said, well, when you're a coach, you've got to have sort of a hands-on approach. I can't have that anymore. So I coach the girls' track team, but instead of coaching the girls' track team, I have to send the boys' track team over to coach the girls' track team because of this concern that anything I do, any action I take will be perceived as misconduct. But the question is, the school board had before it and the disciplinary committee had before it the rap recording and the testimony by Mr. Bell that he intended for this to be heard by everyone and that he knew students would get it because all students have cell phones. So to harp on, and I don't mean harp, but to concentrate on what the coaches said or didn't say at which proceedings doesn't take into consideration what the school disciplinary committee dealt with in a very measured, considerate proceeding and what the school board dealt with when it heard the rap recording and a bit of testimony and ruled. Right, but the school district still has to have factual evidence to show that they acted out of a fear of substantial disruption or because of a substantial disruption. And the record shows they found threatening, intimidating, and harassing language. They're all teachers. Now, I know the claim is, well, that's just ipsy-dixit because the school disciplinary policy says threatening, harassing, and intimidating teachers constitutes a substantial disruption. But they made those findings and we can't require school boards to hold a trial. And our court has said that. And as Judge Dennis has written in the Cash opinion, not much is required to prove the actual disruption. You do have to have some facts. But that's not a high hill to climb. Let me make sure I understand the response you made to Judge Graves' question. He asked you to assume arguendo that Tinker applies. You're not disputing that what Judge Barstow just indicated, what the coaches said and said occurred. Was your point that if Tinker applies the facts before the board at that time through the lens of Tinker that there was not this evidence of what the coaches did? Is that the point you were making? That's the point exactly I was making, Your Honor. That's an important point. But you, I mean, in that context, but you're accepting what the record shows that the various comments by the coaches, et cetera, were made. Your response was in the context of if Tinker applies. Is that right? Exactly, Your Honor. My point is, I would also add that no court has ever held that the type of disruption in a Wildman claim, teachers changing the way they coach or the way they teach, is the type of disruption that Tinker was trying to prevent. The type of disruption Tinker— What the school board has to deal with and the disciplinary committee has to deal with is the instant that they get this message. They can't hold a trial. They've got to take proactive, as the school superintendent said, especially in the background of the increasing gun violence on our schools. They can't hold a trial and just hope that nothing happens before that trial is completed months down the road. They have to deal with what they know when they hear it, don't they? Well, here's what I would say in response to that question, Judge Varshtey. And in your defense, you referenced the calibi school attacks frequently. I'm not saying the school would be helpless. If they heard Taylor's story and they thought it was a concern, they could have called the police, had the police investigate. Before Taylor came to school, they could have searched him. They could have searched his locker. So they wouldn't be helpless. But the point is whether—I'm sorry, Judge. No, I think you're making a very perfectly good point. But my response to that is that it is a much worse blot on a young man's character to have the police come in and investigate than it is for him to be suspended. Yes, it is the first— And the more you push this toward a strict separation between on-campus and off-campus speech, the more you are going to force school administrators to bring in the long arm of the law. And I think that is a very bad consequence for the perpetrators who may, in fact, often be certainly redeemable, but also just acting out of youthful idiocy. Yeah, I see that my time is up. May I answer your question? Yes, sir. I'm sorry. Go ahead and respond, and then I've got a question for you on the red light. Go ahead. Thank you. I'll try that. Here's the thing. The first amendment allows the form. It doesn't allow the latter. And in reality, if you look at all the cases that you referenced, the third state case, the fourth state case, the eighth state case, all those cases the school did call the police. And the police did investigate. And they determined that the threat wasn't serious. So the question here is the school is not helpless. There's stuff they can do to protect themselves from calibi-type threats. But what they can't do is have power that they otherwise wouldn't have. They can't reach into somebody's home and punish them for what they've done. I think you've made the point. I should have asked you this before, but I want to ask you about our case, Ponce, which is post-Morris and that case. I want you to be as straightforward as you can just respond to that, because we're going to ask the other side, and I want this matter to be pure rebuttal. So getting out of the thinker, because we've got Morris, and our court wrote Ponce in that analysis. What's your response to the applicability or not of Ponce to this scenario? I'll make two quick points. First, Ponce, the student, actually brought the speech to school. So he applied for a ticket when he did that. Two, if you look at the facts in Ponce, I mean, the drawing is a calibi-style threat drawing. I mean, there's no public nature to it. There's no real theory. I didn't mean the facts, but the analysis that the court undertook, because that was post-Morris. Morris is after Tinker. Most of the discussion has been about Tinker or not. So not so much the facts, but the analysis that our court embarked upon in that case. I would point to the language in Judge Jolly's opinion when he said, parents and adults are perfectly capable of protecting students from vulgar and violent speech outside of school. This may be Judge Alito's concurring opinion, but I know Judge Jolly referred to it. With violence in many video games, movies, and television, they are already required to do so. So parents have a responsibility to make sure. All right, I'm going to stop you there. You're heading off, parents. I've got you on the record, so it's in the opening. The other side will mention it, but it may come up again. I want to at least have an understanding of what's your view on that case. Okay, you've got a red light. You've reserved ten minutes for rebuttal. We'll now hear from Mr. Griffith. May it please this Honorable Court, today the context in which these communications were made is of absolute importance. We're dealing with cyber communication that is almost instantaneous. We're dealing with communications that occurred one day through Mr. Bell's rap song that reached the school the next day. The school board, in assessing whether or not there is a potentially substantially disruptive effect from those types of communications, does not have the luxury of sitting back and saying, let's wait and see. Does it matter if Mr. Bell put it on Facebook or whether one of his friends overheard him singing and uploaded it onto the net or whether somebody just recorded it? Does his placement of it on the net have any bearing in this analysis? Yes, Your Honor, a direct effect. The fact that he did place it on Facebook and on YouTube and with an intent, we believe, evidenced by that action that it reached the public. So if he didn't put it on there but somebody heard him performing this song in a public venue and put it on there, would you still be bringing this case? I mean, would you still be defending this case? There's the language or two third parties that is utilized in response to other decisions where they're talking about the speaker's intent or subject matter and communications to reach the target. But everything we say has the possibility of reaching the Internet these days. So what's the line? The line would be whether there is a direct specific targeted intent for the speaker's speech, in this case the song, where the song basically said, and the language speaks for itself, stick a pistol down your mouth. In the present tense, Your Honor, I emphasize this. If it didn't say those two statements that we discussed earlier, would you still have a right to suspend Mr. Bell? Because certainly the comments about the coaches could cause a disruption. Is that your position, whether it causes a disruption or not? The disruptive effect comes from the language that is basically saying, cap this nigger, which is blow the head off. So calling the coach a pervert is not why he was suspended. It's not the foul language, which we don't have to approve or disapprove of, and that's not the focus of the school board's effort. The school board was looking at direct specific threats to targeted individuals in real time that was specifically designed, going on YouTube and Facebook, to reach the school, which it did. It reached the school students. So what's your tinker line then? What's the line so that speech of a public nature that's important? What if he wanted to have a Black Lives Matter rally or a Blue Lives Matter rally or wanted to speak about whether Muhammad is a viable prophet or not? These things might cause disruptions, and we know from the news that sometimes these things cause disruptions. Would those be captured in your interpretation of tinker to off-campus speech, or is there a line that separates out those types of things? I would distinguish those from what has actually occurred in this case. Realizing, of course, in Garland, Texas, in just the last few weeks, we're dealing with language that was very insightful to two individuals. That's an entirely different matter. How do you distinguish them? With the test that you promote, how do you distinguish those? The distinction comes in the intent of the speaker for language that is very specific and is specific in terms of the violence, the use of a specific type of gun, a weapon, the type of violence that would be practiced upon the target of that speech. And it's language that is not generalized. It's not generalized fluff that we just simply may disagree with. It's not something the school board just took umbrage with, saying we think that's foul language. That is not the line. But he said his intent was to draw attention to these coaches and to warn them, not to threaten them. So if the intent of the speaker is at issue, Mr. Bell's intent has not really been challenged. Nobody's ever actually said that he meant to threaten the coach, that he intended to threaten the coaches. The relevant inquiry, Your Honor, under Tinker, is whether there was an intent for this to be communicated to the school and whether from that there would be at least a reasonable likelihood of a disruptive effect from those communications. Mr. Griffith, just as a point of clarification, I think the cases in the lower courts that have dealt with these actions have said whether a reasonable person would perceive that there was a threat of violence. It's not based on subjective intent. Intent is evinced by the language. Yes, Your Honor. And the courts have time and again said that the specific subjective intent really has nothing to do with it. It's looking at the objective language and the objective conclusion that one would draw from that. Here it is. I want to be sure, Counselor, you're talking about a Tinker analysis? Yes. You're not talking about some true threat analysis? Your Honor, it is both in this case, and the DJM case from the Eighth Circuit is precisely on point showing this. Well, the district court didn't find that it was both, did it? Yes, it said that it affirmed the finding of threat, it affirmed the finding of disruption, it affirmed both. Well, I thought the district court, when I read the district court opinion, the district court cited Watts, which is a Supreme Court true threat case, and then in the very next paragraph, after citing Watts, it said, but the questions in this case are as follows, and then it went directly to a Tinker analysis. So you're saying the district court in this case applied Watts and found a true threat? Your Honor, we believe the court affirmed both, and both are adequate and independent grounds for affirmance by this Court of Appeals en banc. We believe that the district court specifically undertook a threat analysis. It said that I am affirming the school board's finding of threat, threatening, harassing, and intimidating communication. The school board's finding of threat was part and parcel of the language from the school board's policy, wasn't it? Wasn't the policy just threatening, harassing, and intimidating language? The difference there, Your Honor, is the school board didn't mindlessly say, well, let's check off this and not engage in a meaningful analysis. They engaged in a meaningful analysis with ample due process provisions provided for full discussion, plenary discussion of what occurred. They had Mr. Bell, his attorney. They had the language itself from the school board. So you now maintain that the school board made a finding that there was a true threat? Yes, Your Honor. Not just a violation of its threatening, harassing, intimidating policy, but that there was a true threat? The school board made a finding of threat. It said harassing, intimidating, and threatening language. It also said this was disruptive. And the school board's findings were picked up by Judge Neal Biggers, saying that, number one, the Tinker disruption standard was clearly satisfied. This was disruptive effect or there was enough there for the school board to have made a reasonable forecast of a disruption. And at the same time, the district court affirmed the school board's finding of threat. It was in the context of threatening, harassing, or intimidating language. What's the court finding of a disruption? Well, the threat was in the language, and it was in the present tense language by Mr. Bell. If you say it, it's disruptive. Is that what you're saying? If you say it and there is proof, and there have to be facts, as Judge Dennis has pointed out so clearly in the Cullum decision, you have to have more than just the itsy-bitsy of a school board saying it is because we say it is. And this school board did precisely that, Judge Graves. It went further by saying this was the rationale and the reason for it. And all I'm asking is what facts support a finding that it was disruptive? The facts that support the disruptive finding are the facts that you had teachers, number one, that changed their teaching style, teachers that were affected by this specifically, the language that went to the school instantaneously within a day of its being released on the Internet through YouTube and Facebook. You had the feelable impact that this would have by specifically referring to not only shooting but the type of pistol that would be used to shoot or cap someone. Let me rewind to one of the responses you gave to Judge Elwott's question. Now, you said, quote, the distinction lies in the intent of the speaker. Judge Jones brought you back to the objective standard to which you agreed. So I'm trying to understand what was the anchor of your statement, quote, the distinction lies in the intent of the speaker. It references to objectively evidenced intent. And the objective intent of the speaker arises from the language used. So I got some more. Judge, there is no requirement for any showing of subjective intent. I didn't mean it or I meant it. The requirement is that there be evidence from the communication of the conclusion that can rationally be reached by the prior fact that this was intended to reach the school, that it did in fact reach the school and had a disruptive effect. That's the intent to which I am referring. I think the cases have dealt with that when they distinguish this entire area, this panoply of subjective intent from objective intent that is found from the language. And we know that in Alonis, the case that's been argued before the Supreme Court, read the transcript of the argument, the Chief Justice in the Court goes through considerable back and forth with Mr. Elwott and Mr. Solicitor Dreeben about subjective intent in the context of rap music, whether the stand should be objective, et cetera, et cetera. And my question is not to foresee what they're going to do, but just for a millisecond assume that somehow before we decide this case, Alonis comes down and does say subjective intent. Just if you can for a moment, what would you . . . I'm not asking you to abandon the objective, but just assume before we decide the case, Alonis says, well, subjective, what would your response be in terms of our resolution? I was anticipating that question, Judge, and I'm glad you asked it. The Alonis case in oral argument, and I believe in the briefs, including all the amici, very clearly dealt with the subjective intent requirement in the criminal statute that was at issue. And in this case, if that were the finding, if that were this Court's conclusion, on behalf of the entire Fifth Circuit, that a subjective intent standard would apply, I believe even under these facts that subjective intent would be satisfied, but that is not the requirement. All right. Well, let me stop you. I apologize. I interrupted Judge Elrod, who was trying to come in, and then I interrupted Judge Jones. So I apologize for those. So back to Judge Elrod, and then to you, Judge Jones, and I'm sorry I cut you off. You said one of the indicia that this was disruptive was the fact that the teachers changed their teaching style. But doesn't that go to whether the coaches are touching the women, rather than whether or not the coaches are threatened by the violence? So I don't understand what you mean by that answer. Both coaches said, I am scared. They were in fear because of the language. And one said it very specifically. He said, these days, you cannot tell what someone means when they say words like this. But whether or not the ---- I'm sorry. You may continue. Oh, Judge Gray, let Judge Elrod finish. But whether or not they're having to have males coach women because of this, that's not the same. That's not relevant, is it, for this determination? That, I do not believe, was the focus of the coaches' remarks. They were basically saying, I had to pull back from my hands-on teaching style. I basically had to observe and be a passive coach. I could not. And disrupt just simply means to break apart. They had to break away from and break apart from their teaching style and method. That was one of the factors. But it was, I think, a very important factor in the disruptive effect. Is there a fact issue on this? I do not believe so, Your Honor. I believe this was a matter of law because the parties not only had cross motions for summary judgment, there were not any genuinely disputed issues of fact that were raised at the preliminary injunction hearing level. And there were not at the original panel hearing that took place two years before the panel's decision was rendered. And that issue of whether there was a genuine issue of material fact has been repeatedly answered by both counsel that, no, we did not believe there was a fact issue. And we don't just believe that. We believe the record, the summary judgment record evidence, amply supports the conclusion that this was a matter of law for the district court. And the district court rendered it based on a dual, for Judge Graves' sake, a dual standard. One was the disruption standard undertaker, and the other was the true threats analysis on the watch. And it did so correctly. Well, it's been on the law ever since Bose v. Consumers Union, hasn't it, that it's for the courts to characterize the protected nature of speech, not there aren't fact issues. Correct, Your Honor. That's why we deal with it as a pure question of law. That ties in very nicely to what I wanted to ask you because, based on Judge Graves' question about threat, as I understand it, school boards react and they make findings. But they're not required to say, all right, based on A, B, C, and D, this constitutes a true threat under Watts. Based on E, F, G, and H, this constitutes a substantial disruption under Tinker, etc., etc., etc. They simply make findings and decide we need to take disciplinary action. Isn't it for the courts then to come back in and look at the record and decide whether the discipline falls under either Watts or Tinker? Yes, Your Honor, and they do so in the context of what I believe Judge Dennis has said so eloquently, and it is not a very heavy burden. But the burden is there and the burden remains with the school board to establish those facts. I believe they were established here. Counsel, if we don't keep the wall between on-campus and off-campus in the way that perhaps some have argued in this case and do allow this sort of posting on Facebook and otherwise to breach the campus and be treated as if it was on-campus speech, where does that take us? I'm thinking of Justice Alito's concurring opinion in the bonk suit for Jesus when he talks about under Tinker you can restrict speech advocating drug use, you can restrict lewd speech on campus, drug use speech on campus. If we bring the Internet into this and Facebook postings, it would seem to me all of that applies to whatever is posted on the Internet too, so long as, whatever the other standards may be, we're trying to make sure subjectively, objectively, the speaker was trying to reach the audience of the school students. Whatever the benefit and perhaps persuasiveness that might apply here to what are threats, it seems to me it's troubling to apply these other categories of speech that can be prohibited by school districts if they are posted on the Internet. So if you're building your house of argument on this idea that there's no distinction, aren't those components of your structure as well? Isn't it troubling to say that off-campus postings on Facebook advocating drug use and these other things can be regulated by the school so long as they're directed at students? The missing element for Tinker analysis purposes is substantial disruption or the proper ability factually under a record to say there is a reasonable forecast of that disruption. If that element is there, Judge Southwick, I believe, yes, the Tinker analysis would be fully applicable to communications that may originate off-campus but have a foreseeably disruptive impact on the campus. Frederick B. Morris did not rely on the impact. It allowed, it seems to me, you've studied the case at least as well and probably better than I have, Frederick B. Morris, it relied on just the nature of advocating to students, juveniles, the suitability of using illegal drugs and Chief Justice Roberts in his opinion says the message in Frederick's was vague or was ambiguous but ultimately concludes that it was actually a message best understood as advocating the use of illegal drugs. So that wasn't a disruption issue, it was a category of speech issue it seems to me and that's the problem seems to me also if you're using off-campus as just analogous to the case law that already exists about on-campus speech. Your Honor, that's a good analysis. If Morris were sought to be the basis for the off-campus speech, on-campus effect, Morris is not the direct basis. Morris I see as a very strong pronouncement by our Supreme Court with Judge Aliota's concurring opinion saying there are certain classifications of speech where we don't even get into tinker. We're talking about per se prohibited speech that advocates use of drugs. Is Ponce an example of our doing that for threatening speech? Very closely. Outside of two threats or just threatening speech? Ponce was one decision by this Court I think that is very instructive along with the Porter decision. Ponce basically in terms of the goth type language that was used, very, very vitriolic, not just hateful, but language that was specific in terms of its violence that was targeted to this young girl. And it was violence that was in the sense of goth standard is violence that was threatened toward her and directed toward her. Let me ask you this. The term nigger was used like 13, 14 times during the course of this speech. If that had been done on campus, is there a difference in the treatment or the protection that it has under the First Amendment from school discipline as opposed to off campus? Again, I would go back to Cash v. McCollum. I think there you're dealing with insightful language that could potentially cause student fights. It could cause student uproar. It could be just like the Confederate flag. It would have that same effect, and I believe it would change the analysis on campus with that type of language. So there can be a distinction between off-campus speech and on-campus speech while at the same time recognizing that off-campus speech can also be unprotected. Yes, Your Honor, in the context in which that language is used. And this is a classic example because it was not the use of the horrendous term, the N-term, nigger, multiple times in this song. That was not the basis for the lower court or the school board or the disciplinary committee's action. Well, does the First Amendment protect this student's communication with fellow students referring to the black race as nigger 13 times? Off campus where there is no reference to any of the three key threatening, violent-oriented, gun-related remarks. If those were completely absent from this case, you'd have a different case. This would be a different factual scenario. And off campus I question whether there would be a clear line of authority for the school board to have acted, and it probably would not have. If disruption had occurred, it would make a difference. Yes, sir. And that would have to be shown by facts or a clear factual basis to forecast that type of disruption. Well, counsel, the use of the N-word in this song, these cultures, one of the cultures is white, is that correct? Yes, one is white and one is black. And the word was used in reference to both of the cultures. Isn't that also correct? Yes, Your Honor. All right. I thought cracker was used also. Oh, yes. And cracker is a white, I mean, I guess it's the N-word for somebody that's white and you want to insult them. Both are pejoratives that are used just in slang. He used them indiscriminately in this song. Absolutely, Your Honor. And, counsel, you said that. Does that make a difference? No. We're talking about language that itself was not, language itself that was not disrupted per se. The use of the word nigger or cracker, that was not even an issue as to the source or cause or the origination of the disruptive effect. It was the context of it. Mr. Griffith, isn't it fair to say this is not a case about what other hypotheticals might be about political speech or sexual speech? This is a case about I'm going to put a gun down your throat, pal. Yes, Your Honor. And that was the basis on which the school board suspended the fellow. Yes, Your Honor. That's correct. And those are the three bases. We don't need to go into highfalutin, philosophical, metaphysical discussions beyond that, really, do we? Are you saying, will you finish, Judge? I'm sorry. Mr. Griffith, is it your position, several times in the last few minutes, you've talked about pulling those lyrics out that deal with murder. Are you saying as a category of speech, a student who uses that with other qualifications intended to reach, objectively intended to reach a student audience, et cetera, but as a category of speech, a student can automatically be disciplined for suggesting either himself or others ought to be considering murdering somebody on campus? As a category of speech, in rap music, in a journal, in something else, that can be prohibited? There are extreme cases where the court, and this is hypothetical, where a court could very clearly say this is so preposterous, what five-year-old could possibly pick up an AK-47 and shoot his kindergarten class? And I could see that type of case coming up as a matter of implausibility. And the courts have addressed that as a backstop, Your Honor, in terms of saying there are certain types of threats that are in anybody's book, not plausible, not likely, and as a matter of law can't be considered to be foreseeably threatening to the intended recipient or class of recipient. Mr. Griffith, are you saying that if Mr. Bell had recorded a rap song, the dominant and consistent theme of which was it was terrible that these coaches were sexually abusing female students and he had not used the imagery of violence, the imagery of a good weapon or capping or anything, that language that is pretty common to rap songs, if he had taken that out, then the school board would not have been able to punish him? I do not believe the school board would have taken action. That's a hypothetical, but to answer it directly, no. And the reason is that there is nothing in there that constitutes use of a gun, a specific gun to stick up someone's mouth, to put a pistol in someone's mouth, and to blow the top of their skull off. None of that language being present, you don't have the factual basis and the summary judgment record that was before the district court. How do you square that with the terrible things on the signs in the Snyder versus Phelps case that the Supreme Court said, even though the terrible things were said on the signs, signs that these pickets were carrying, that nevertheless they had the right to express their views on the main theme of their speech, which was that America is becoming demoralized, America is approving of homosexuality, America is allowing homosexuals in the armed services. That was their main theme, even though part of it was very hurtful to the Snyder family who were trying to have a funeral to bury their poor dead son. The Supreme Court said, nevertheless, we have to, if they did not do anything but that, express their view about the terrible things that are happening in this country because God is punishing us for approving of homosexuality, they have a right to say that. And they did that on public property, and they spoke on a matter of public concern, and we have to uphold that, even though it may be distasteful to some of us, because if we don't, we can't allow freedom of speech on matters that matter very much to us in governing ourselves as a democracy. So how can you say that you have the right to punish Bill simply because he allowed some vulgar and violent imagery and words to be part of his main speech, which was against molesting female students by coaches? We do not take that position. Our position is that when threats are made in the specific context of putting a pistol in your mouth in the active tense of speaker to recipient and in the context of putting a Ruger, hitting you with my Ruger, that's a Sturman Ruger pistol, that will blow a 9mm hole in a body, those are very specific, targeted, and there is no other way to look at them other than matters of physical violence and mayhem. Now, to answer your question, this is not a school board saying, we disagreed with the tenor and the tone and we don't like the language used and we're offended. This is not a matter of mere offense. This is a matter of a school board taking immediate and proper proactive action immediately at the point this communication reached the school to interdict it, and it did so properly in a reasoned, careful, thoughtful manner, and it did so in a disciplinary hearing and a school board hearing. Mr. Griffith, you do recognize, though, that there was no evidence of any personal animosity between Bill and these coaches before this happened, that Bill had not had any disciplinary things on his record except for tardiness, that there's no showing he had a Ruger. There's no showing he was a violent person. Your school board official didn't call the police. They let him stay there on the school and go home on the school bus. Nobody called the police. Nobody thought that Bill himself was going to be a threat to these coaches. Isn't that right? I know your question. If I may say, from prior course of dealing, I understand the question before you even asked it, Your Honor, and I think it's a very good one, and I think what you're asking is this. Are we dealing with a situation where a school board has simply been offended by something and has decided to shut down a student with censorship? No. Are we dealing with a matter in which a school board, with its heavy responsibility, in the context of a post-Columbine violence in schools culture that has been capped by the horrendous events at Sandy Hook and 100 shootings involving guns in public schools, we're dealing with that type of context and only in the specific context of the facts of this case, but we're not dealing with a school board saying we're offended by the language? That goes to the heart of First Amendment protection, and that is the type of protected speech that is not at issue in this case. I have to... Go ahead, Judge Graves. Let me get Judge Graves and then back to Judge O, and then I have a question. And I'm trying to determine whether or not your point is that there was this fear of some imminent violent act. Is that your point when you describe the Ruger... Yes, Judge Graves. Both coaches said, I am afraid. This scares me. And you brought it up again, Mr. Griffin. I'm not going to claim I read every word, but my recollection of Coach Rainey's testimony is at the time he testified at the hearing on the preliminary injunction, he said, I've never listened to the song. I've stayed away from the song. He said, I viewed it as just a rap song, and I figured if I left it alone, things would just die down. Isn't that what he said? But it didn't, he said. But it did not just get left alone. It came... That's fine, but where did he say he was afraid? Hold on a second, Mr. Griffin. So you're saying he said he was afraid? Both coaches expressed in their own testimony their either fear or the fact that they were afraid or scared. And so the record will reflect that Coach Rainey testified that he was afraid? I believe both coaches, both coaches. All right. And further in that connection, on the day the school learned about it, Principal Weigel drove Bell home. Isn't that correct? She drove him home because of... Despite all the fear. Because of inclement weather, she took him home. She drove him home. And then on the day they told him he was suspended, they allowed him to remain at the school for the rest of the day. Isn't that correct? But, Your Honor, what you're missing is so important. That's the... There was a reasonable forecast of disruption that is an adequate and independent basis for invoking the Tinker Disruption Standard. That's being completely missed by... And then he rode the school bus home that day. Isn't that right? Right. But what you're resting upon, Your Honor, and you can't from a judicial standpoint, you can't rest upon proof of actual disruption. The cases are legion that say there is no requirement for proof of actual disruption if there is a legitimate basis in the evidence for a forecast of disruption. Let him finish, Judge Berry. I'm sorry, Your Honor. I apologize for talking over you. Let him finish responding to the question. I'll squeeze it in in the next five seconds. Go ahead and respond. Respond to the question. I tried to answer it just then, but there is no basis for us to say that this is simply a matter of language we disagree with, but we're dealing with multiple, at least seven major factors that indicate the disruptive effect. Among those were the coach's reactions, their change in teaching style, the disruptive effect, and their very ability to deal hands-on with students who were their charge and they cannot do that anymore. They're not even in the system now. All right. Judge Elrod had a final question. Thank you. Go ahead. We need to have a test, a rule, that we apply, and I'm wondering why the Ponce rule extending to teachers would not be adequate given that you focused entirely on violence. And if the Ponce rule is not adequate, then which of the circuits' tests do you turn to? It seems that the Ninth Circuit is the one that goes to threats of violence. So tell us which circuits' tests you wish us to adopt if we have to go there, but tell us first why Ponce would not be good enough. Ponce is almost adequate, but Ponce was prior to the cyber revolution and the school violence revolution that we're in now. It was a fairly recent decision, well-reasoned, well-written. It's one that gives you a basis, I think, for extending Ponce to the type of disruptive effect and the true threat analysis here. And it's both, Your Honor, and that's the DJM case from the Eighth Circuit. I think that would be your classic case in which, Judge Graves, I know in an earlier argument we had some argument about can you say it's threat or disruption. It is both. And, Your Honor, Judge Elwod, this is an adequate and independent basis constitutionally for the action of the School Board of the FL. Disruptive effect? The DJ has not limited the threat. It doesn't have that as a limit. It just says reasonably foreseeable that it would reach the school community on the Tinker Park. The only problem with Ponce 8 is a concern I've got about it and somewhat it could be interpreted as a per se rule, and it's not. All of these are intensely factually dependent, and that's why it's so important to have the record in front of this Court for summary judgment purposes. And on that basis, we would ask this Court unbonk to confirm the action of Ponce. Hold on before you leave. My question was to follow up about Ponce, but I think you've responded to it, so I'll yield on it. I think Judge Higginson was getting my attention, and I'll recognize him for your last question. I'll yield on mine. It was about Ponce, but I think you've responded to that. So, again, sort of a variation on Judge Elrod's question, what case where a circuit has extended Tinker to off-campus speech discusses the nuance that I think exists in this case, which is allow school to punish deadly violence but never allow school to punish student inartfully complaining against alleged teacher misconduct? Oh, that's the second, the Fourth Circuit, the Eighth Circuit, and the Ninth. No, but which is the best one discussed? The very best is D.J.M., the D.J.M. case in the Eighth Circuit. And that's cited, and it's picked up on by later cases out of the Eighth Circuit. The Ninth Circuit's Weiner. So they're saying, last follow-up is, therefore, you're saying D.J.M. discusses how the Tinker analysis actually accommodates that duality? Yes. Okay. It's very specific, but there are now more recent decisions, and I think we've cited those from Dariano and Weiner in the Ninth Circuit, and they are very clearly on point saying it's a dual standard. If you want to rest your case upon one basis, fine. We believe there are adequate and independent constitutional grounds for affirmance on either. All right. I believe D.J.M. is classic precedent for that, Your Honor. All right. Thank you, Mr. Griffith. Thank you, Your Honor. Appreciate it. All right. Mr. Cone, you reserve time for rebuttal. Thank you, Your Honor. I want to get straight to this point of whether Mr. Bell saw direct and specific threats of violence. First of all, I want to ask you one question, that if he said unmistakably, clearly, I'm going to kill and name the teacher in his lyrics, would that be protected at school speech under the circumstances here? Your Honor, what I would say is that you would apply the truth or analysis. First of all, I would not. No, I ask you a question that can have a yes or no, and then you can explain, but it seems to me, would it make a difference if it was unmistakably a threat to kill a teacher? Is that protected school speech or not? You have to put it in context. I'm talking about the context of this case in which you know expressly that he made that threat. If he expressly made that threat, then there's a potential that it could be a true threat. I'm not talking about truth. I'm just asking you one question. Is it protected speech or is it not? Your Honor, here's the problem when you ask me the question, because I'm of a younger generation. Okay, you're not going to answer? Sir, go ahead. I'm of a younger generation, and so I'm familiar with hip-hop and rap music, and I know that if you think Mr. Bell's lyrics are bad, go to the Internet and listen to a whole bunch of hip-hop artists who have speech much worse than his lyrics. So are school administrators supposed to be experts on hip-hop, rap, and all other forms of music and poetry and then have to make that distinction based on a Ph.D. and those various forms of comments in order to be able to suspend a student? No, but there has to be a reasonable basis to find that they acted out of fear of violence. And I think Judge Gray is absolutely right. The first thing that Interwobble did when they heard Taylor's song, the first thing they did was they called him in the office and they asked him about the allegations of misconduct by the teachers. They weren't concerned about the threat of violence, I'm going to put a pistol down your mouth, which he did not say. Nobody claims that Taylor said that. Wait a minute. Where is that in the record, that that's exactly what they did? If you go to the disciplinary hearing, which I was at, that's what the principal said. That's what Taylor said. They called him in his office, and they asked him about the allegations of misconduct. He didn't want, at first they said he initially didn't want to answer, but then he told them who gave it to him. So if you look at what students gave him those allegations, what students told him that, who were the students that said it. And if you just look at their actions after they heard the song, they never acted like they were concerned about fear of violence. Judge Barstow is absolutely correct. Let me ask you a question, Mr. Colon. I mean, again, we're in the school context, and Justice Roberts said, quoting the Vernonia case, that what is appropriate in schools is different from what's appropriate in society at large. Suppose all these kids, Taylor Bell inspired copycats, and they all started taking rap music that threatened teachers, and they all started posting it and communicating to each other. Don't you agree that that would undermine the discipline and the teaching function of the school? It would distract everybody from the mission of the school. It would also threaten the school. Don't you think there's a point at which this kind of thing can cascade? Well, Tinker does allow schools to regulate speech that has the potential for disruption. Well, that was the silent wearing of an armband. But it's important to know the context. Tinker said that students retained their personal memory rights at school, which implies that, of course, they have it away from school. And the point of Tinker was never about controlling what students say or hear. It was never about that. We're a long way down the line from Tinker, and Hazelwood said that when the school sponsors a speech, it has an obligation. And then there was a case about the kid who was spewing sexual content in a speech at school, and he or she was disciplined. And then there's Morse v. Frederick. And we have Justice Alito's concurrence in Morse v. Frederick. So we're a long way from pure Tinker world. I agree, Your Honor, but those are all school-sponsored speeches. But here's the thing. It's where do you draw the line? I mean, does it basically become the line you draw at a schoolhouse gate? Because the First Amendment was always Tinker and all the other cases are all about what happens at the school. It's not okay to stand three feet away from the schoolhouse gate and send something out to 1,300 Facebook friends on the Internet. That's not okay. But it's okay to step inside, one foot inside the schoolhouse gate, and send out a message on the Internet to 1,300 Facebook friends. That's your point? Absolutely, Your Honor. And I'm going to tell you why. Okay. I'm sorry. I'm sorry. Go ahead. Let him respond. I'm exempted. Go ahead. Absolutely, that's a big difference because Tinker was all about controlling disruption at the school, making sure students didn't get up in class and give speeches. Now, it was never about controlling what students heard. And so the fact of the matter is Taylor Stone could not be heard at all. They blocked Facebook. They blocked YouTube. You couldn't bring cell phones. Okay. Nobody could. The way I understand your argument, now that you framed it this way, is that this whole case is about off-campus speech, that if he had made it on-campus, it would have been prohibited or could be prohibited. If it's off-campus, it cannot be prohibited. Now, that's exactly what I understand you've just conveyed to us. That's the case. That's one of my arguments. Well, I mean, that's the case. No, no. I can say even if you apply, Tinker, as the majority panel did, we still should win because there's no evidence of substantial disruption. I mean, the reality is the school board has to win. Okay. So you're saying in this case if he had said on-campus that I am going to kill one of the teachers or I'm going to cap the head off of him and use all of the offensive language that he did, and there was no disruption, there was no palpable disruption, that that could not have been prohibited. The first thing I want to say, Judge, I want to make sure because you're mischaracterizing the lyrics of the song. Taylor never said I'm going to put a pencil down his mouth. He never said this idea of this rougar, right? Well, in the preliminary hearing, they referred to it as a rougar, right? And Judge Bartel went back and forth about whether it was rougar or rougar. Well, see, that's the problem. When you're trying to interpretate lyrics. Again, better. You're going to, present tense, you're going to get a pistol down your mouth. Messing with the wrong one. Messing with the wrong one is going to get a pistol down your mouth. So it's conditional that you're messing with students. But that's if you take the lyrics seriously. That pretty much extends it to the individual he's talking about. Well, here's the thing. He doesn't have any children, so he wasn't talking about, you know, his children. He said if you're messing with the wrong one, and he said it in his committee, he's talking about parents. But the reality is, you know, I understand that the panel, some of the judges on the panel don't like this song. But the only way that. I thought somebody threatened to kill a teacher. He didn't threaten to kill a teacher. That's an unreasonable view. Mr. Cullen, let me follow up just a minute on Judge Jolly's line of questioning. Assume that you have been hired as the counsel to a school board. Sure. And you are asked a question by the school board, is there any speech or conduct that occurs off campus for which we can discipline the student? And let me explain that that question would involve both in First Amendment-protected speech or conduct or non-First Amendment-protected speech or conduct. What would be your answer to that school board as its attorney to obviously protect it from any potential liability? What I would tell them is that, as the Supreme Court has recognized since, you know, the founding of our Constitution, based on my understanding, is that a 18-year-old does not have less First Amendment rights than a 35-year-old. So if you apply the true threat analysis, just like you would with an adult, if there's a true threat there, then the state can regulate it. But outside of it being a true threat to say that the state now has the power to regulate what students say anytime, anywhere, whenever the school decides it doesn't like the song or it says the song references violence, what you're going to get is a slippery slope. And it's going to lead to cases like KGS v. Kim. Are you saying that you, even if you don't threaten a teacher, that it's okay and it's not a disciplinary basis to intimidate and harass a teacher? Your Honor, what I'm saying is that a student away from school has the same First Amendment rights as it does. No, sir, I'm not asking about away from school. I'm saying are you saying it's okay, whether it's off campus, on campus, it's okay to harass and intimidate a teacher? Personally, as an adult, I would say no. And going back to Judge Jolly's question, if Taylor had made this song at school, even if there wasn't any evidence that there was going to be disruption, yes, the school could regulate it because you obviously can't have students in the middle of class getting up and doing rap songs. Even if it had nothing to do with the school. He stood outside the door at the end of a session in the auditorium, and as the students walked out of the door to go to class, he did his rap song. But the Supreme Court has always said that. The question is, what about if he stood outside the door to the auditorium and performed this rap recording when the students are just walking to class? Can that be disciplined? It can be disciplined because that's in-school speech. But the problem is it can't reach into a parent's home and say, I don't like what this student posted. It's just a slippery slope. Go to KDS versus Kemp. A student at a public golf course, a public golf course, he writes a derogatory term. He used the N-word, too. He used the N-word on a public golf course. I'm sorry. I'm going to let you finish in one declarative sentence with no commas, the concluding remark, and then that's it. Can I ask one question? Before you do. You're taking a strong-willed, bright-lined position, but I worry it doesn't accommodate competing interests. I have a sort of three-part question. One is your position, this primary position, one that would, in your mind, have us create a split with every other circuit that's extended Tinker to off-campus speech. So, legally, that's a problem I have. Factually, it is relying on Tinker that preceded the Internet, and it's in a context where every public school that has coaches coaching are going to be using fields that are off-campus. So, factually, I've got a problem. And the third problem I have with it is, looking to the future, what you seem to be saying is, well, don't have states take over the role of parents, but you're essentially saying the schools should be calling authorities, police authorities, and have the state criminal apparatus take it over. So it's a bright-lined, strong-willed position, but it has problems for me legally, factually, and then as a rule going forward. Well, Your Honor, I think even if we don't draw that bright line, which I think we should, I think we still win. I understand. But I think factually the important thing to say is that the reality is that law enforcement, a separate entity from the school, they're not going to be worried about the school's reputation. Okay. And so they're trained on investigating threats, and they can do a proper analysis of what the sincerity is. But when you have a school who are not trained in that field, they can just say, well, we don't like Taylor Song. And this idea that it's so clear that it's a threat, it's so clear it's a threat. Well, the school disciplinary committee heard it and said, well, we think it's bad. All right. I think we have your argument. Your Honor, I believe you responded best you could. Thank you. Thank you. All right. All right. Thank you, counsel, for both sides for the briefing and argument. The case will be submitted. This concludes our session.